814 A.2d 656 (2003)
357 N.J. Super. 155
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
L.A., Defendant-Appellant, and
R.S., Defendant,
In the Matter of K.S. and S.A.,[1] Minors.
Superior Court of New Jersey, Appellate Division.
Argued December 3, 2002.
Decided January 27, 2003.
*657 Lujuana M. Lee, Staff Attorney, argued the cause for appellant (Camden Regional Legal Services, Inc., attorneys; Ms. Lee, of counsel and on the brief).
Scott Kieserman, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Acting Attorney General, attorney; Patrick DeAlmeida, Assistant Attorney General, of counsel; Mr. Kieserman, on the brief).
Yvonne Smith Segars, Public Defender, attorney for minors K.S. and S.A. (Sheldon M. Blackman, Assistant Deputy Public Defender, Law Guardian, relies on the brief submitted by respondent, N.J. Division of Youth and Family Services).
Before Judges SKILLMAN, CUFF and WINKELSTEIN.
The opinion of the court was delivered by *658 CUFF, J.A.D.
In this appeal, we review a finding of abuse and neglect pursuant to N.J.S.A. 9:6-8.21c. Because we find that the trial judge improperly admitted a prior statement of one of the children and based several findings of fact on the statement, we reverse and remand for further proceedings.
L.A. is the mother of two children: K.S., age thirteen, and S.A., age two. Both children resided with L.A. R.S., the father of both children, had sexually assaulted K.S. and was barred from L.A.'s home. The events giving rise to the finding of abuse and neglect against L.A. occurred at least one year after the assault and after R.S. had been barred from entering the home in which L.A. and the children resided and from having any contact with the children.
Our review of the record compiled in this proceeding is hampered by the efforts of L.A.'s counsel to preclude discussion of the sexual assault by R.S. against his oldest daughter, K.S. The attorney for L.A. sought to confine the trial judge's consideration of the actions by the mother solely to the events giving rise to the complaint filed by the Division of Youth and Family Services (DYFS) arising out of an incident which occurred in January 2002. While counsel's purpose is understandable, the result is a record so truncated that it lacks context and we are left to piece together the events which occurred prior to January 11, 2002, in order to appreciate the gravity of DYFS's concern about the welfare of the children. The trial judge and the attorney representing DYFS were fully informed of the facts developed in a prior proceeding initiated in late 2000 or early 2001 and concluded in April 2001. However, none of that information is available to this court. Such a record not only may frustrate appellate review, but also may unnecessarily complicate the proceedings. In such circumstances, reference to and incorporation of the record of the prior proceedings may be the appropriate course. See New Jersey Div. of Youth & Family Servs. v. J.T., 354 N.J.Super. 407, 414, 807 A.2d 270 (App.Div.2002) (trial judge properly took judicial notice of his findings in an earlier domestic violence hearing).
We glean from this record of the plenary hearing conducted on May 9, 2002, that K.S. was sexually assaulted by R.S. sometime in 2000. On January 2, 2001, a restraining order was entered barring contact by R.S. with the children.[2] It also appears that K.S. had been removed from L.A.'s custody but was returned to L.A.'s custody in April 2001, at which time the no contact order was continued.
On January 11, 2002, R.S. entered L.A.'s apartment. L.A. and the children were present as well as J.M., a mutual friend of L.A. and R.S. Unprovoked, R.S. grabbed J.M., who immediately directed the children to go to the other room. R.S. left after J.M. called the police. At trial, J.M. testified that he was unsure why R.S. came to the apartment. He admitted, however, that he had borrowed money from R.S. on a previous occasion.
In its complaint, DYFS alleged that L.A. failed to protect her children from R.S. in that J.M. rather than she ordered the children to leave the room, that she failed to inform DYFS of the January 11 incident or file a complaint against R.S., *659 and that she invited R.S. to the apartment that day or informed him that J.M. would be there to enable R.S. to collect the debt. Furthermore, DYFS alleged that L.A. had failed to inform the agency of the January 11 incident after the fact or failed to seek enforcement of the no contact order.
In support of its complaint, DYFS presented the testimony of Tara Brogan, a caseworker. She interviewed J.M. and as a result of that interview, she decided to conduct a formal investigation. As part of this investigation, Brogan interviewed K.S. at school. Brogan testified that K.S. told her that L.A. called R.S. and told him to come to get his money from J.M. and that L.A. had taken the youngest child, S.A., to visit R.S.
Following the interview with K.S., Brogan interviewed L.A. Brogan testified that during the visit she observed the following message on L.A.'s telephone screen, "Don't tell them [R.S.] was there or the State will take them. People with sex crimes can't be around kids." L.A. is hearing impaired and uses a text telephone to communicate with others.
On January 17, 2002, DYFS filed a verified complaint seeking custody of K.S. and S.A. An order was entered that day removing the children from their mother's care and placing them in the custody of DYFS. We were informed at oral argument that the children remain outside the home in the custody of DYFS. A dispositional hearing has commenced but was adjourned until January 10, 2003.
During the fact-finding hearing, L.A. requested an in camera interview with K.S. The trial judge denied the request; she reasoned that an interview would subject the child to further trauma. At the conclusion of the hearing, the judge found that L.A. had neglected her children because she had failed to protect them from contact with R.S. She noted that a prior abuse and neglect case had been closed in April 2001 by the entry of an order requiring counseling for L.A. and K.S. and contained "an absolute no contact order" between R.S. and K.S.[3] The judge found that L.A. understood the order. Furthermore, the judge found that the events of January 11, 2002, were undisputed and that J.M. was a credible witness who did not embellish his testimony or change it in any way to favor L.A. As to L.A.'s role on that day, the judge found:
[I]t was not [L.A.] who tried to have him leave or who called 911, or who called the police or who called DYFS. It was not [L.A.] who made sure the children were removed from the room where this altercation occurred. It was not [L.A.] who made sure the children didn't come in contact with [R.S.] or see him, it was [J.M.]....
So the Court isn't as concerned about what [L.A.] failed to do than as much as what she may have done. I don't know if she invited [R.S.] over or not, I don't have enough proof to make that finding. But that was-he must have felt it was okay to come right in the house, door unlocked or locked, because there was no question but that he came in, and it was not [L.A.] who asked him to leave until she saw him trying to hurt her friend, [J.M.], then she asked him to leave, not because the children were there. There was no testimony that she asked him to leave or was upset because he was there because of the children, but because she was afraid there'd be an *660 altercation between he and [J.M.]. The Court notes that [J.M.] is a slight small man, and I recall that [R.S.] is a much larger, heftier fellow. And, perhaps, [L.A.] was worried that if something happened, the police would have to be called and then it would be known that [R.S.] was there.
So that's the concerns of the Court. Whether she invited him or not, I don't have enough proof of that. However, the fact that he was there and her concern was not for the children. I didn't hear her testify that her concern was the children. I find that [J.M.] is the one who immediately upon seeing [R.S.] saw he was angry and immediately got the children down the hallway and into a different room. It was he who was protecting the children. It was then he who called 911, despite the fact that he was tussling with, or [R.S.] was physically assaulting him, and it was he who then called DYFS and made contact, not [L.A.].
The judge also found that L.A. initially denied that R.S. had been in the home on January 11 and further found that L.A. never intended to reveal that he had been in the home. Therefore, the judge found that L.A. had not "made any positive or assertive efforts to report this incident on her own, or to insure that no further incursions into her home by [R.S.] ever occurred again. I believe she tried to keep it quiet." The judge further found that L.A. had not taken any steps to protect the children from a future encounter with R.S.
Then, after initially stating that she did not have enough proof to find that L.A. invited R.S. to her home and that she was concerned more with what L.A. may have done rather than with what L.A. failed to do, the judge proceeded to consider the statements made by K.S. to the DYFS caseworker and found those statements "highly credible." The judge stated:
[K.S.], the Court finds has been found to be close to her mother, loves her mother. Her attorney and the law guardian tell the Court that she wants to be with her mother. And it is in that context that the Court views the statements that [K.S.] made to the caseworker. [K.S.] is now, what, 12. She has to know that she was removed once and she was returned, she knows about the restraining order. She knows daddy is not supposed to be here. She's the one that told [J.M.] he's [R.S.] not supposed to be here.
So in the context of [K.S.] loving her mother, number one, wanting to be back with her mother, number two, and, three, knowing that it was wrong for [R.S.] to be there, the Court finds that her statements to the caseworker and to the Division investigating it had to be highly credible, highly credible. And she's of an age, 12, where I find she knows the difference between the truth and a lie. And as much as she loves her mother, she was not going to lie. I find that she said that my mom called my dad to come over to get money from [J.M.]. [J.M.] corroborated that he owed [R.S.] money from a car loan, and so that makes the child's testimony highly credible as well as [J.M.], who is a friend of both of them.
So the reason that [R.S.] came to the house was to get money from [J.M.], or to beat him up to get money, but the fact is that the child knew that the mother called and alerted [R.S.] that [J.M.] was there and he could come over and get the money. That isn't an invitation, it's certainly an opening. And how else-unless [R.S.] was stalking the residence and watching, how else would he know that [J.M.] was there to burst in and immediately go to [J.M.] and demand *661 money. I don't think he can see through walls or doors, so that's highly suspect.
... I believe that [R.S.] knew that [J.M.] was there, and I believe it because [J.M.] corroborated he owed [R.S.] money and [K.S.] told the caseworker that my mom called my dad to come over to get money from [J.M.]. So I accept that as a finding of fact.
Further, ... I find that [K.S.], and again, loving her mother and not wanting to be separated from her, did, and I find honestly, revealed to the caseworker that [S.A.] was taken by [L.A.] when [L.A.] was visiting or spending time with [R.S.]. That was a clear ... violation of the no contact order of this Court.
The judge also found that L.A. was remiss for not having the no contact order handy. Moreover, when L.A. found the order in February or March, she did nothing to enforce the order. Therefore, the judge concluded that L.A. had failed to protect her children by allowing contact with R.S. because "[s]he has allowed access either on the day that he came into the home, by either inviting him in or not causing him to immediately leave, or herself reporting it."
On appeal, L.A. argues that the trial judge improperly denied the request for an in camera interview with K.S. and erred by basing a finding of abuse or neglect on the contents of K.S.'s prior statement to the DYFS caseworker. L.A. also contends that K.S.'s prior statement required corroboration to be considered. She further argues that the trial court based its decision on information outside of the record and that there was insufficient evidence to support the finding of abuse or neglect. The State argues that the judge's finding was not predicated on any statement by K.S. and the evidence was sufficient to support a finding that L.A. had failed to protect her children.
As a threshold matter, we consider whether the May 9, 2002 order is a final order or an interlocutory order. An appeal may be taken to this court as of right from a final judgment of the Superior Court trial divisions. R. 2:2-3(a)(1). Appeals from interlocutory orders may be taken only by leave granted by this court. R. 2:5-6. In actions initiated in accordance with Title 9 alleging abuse or neglect of a child, the Legislature has also declared that an appeal may be taken as of right from any final order made pursuant to the act. N.J.S.A. 9:6-8.70.
Actions initiated by DYFS charging abuse and neglect of children are governed by statute. N.J.S.A. 9:6-8.21 to -8.73. Upon the filing of a complaint alleging abuse or neglect of a child, the statute anticipates a fact-finding hearing and a dispositional hearing, if there is a finding of abuse or neglect. N.J.S.A. 9:6-8.47. The purpose of the dispositional hearing is to allow an inquiry "into the surroundings, conditions, and capacities of the persons involved in the proceedings," N.J.S.A. 9:6-8.48b; see also N.J.S.A. 9:6-8.45, in order to fashion an appropriate order. N.J.S.A. 9:6-8.51. Although the statute anticipates that adjournments may be required to marshall the information to not only support a finding of abuse or neglect but also to fashion an appropriate order, N.J.S.A. 9:6-8.48, the Legislature has directed that proceedings involving imminent harm to a child or in which the child has been removed from the home pending a final order of disposition should be given priority and any adjournments "should be for as short a time as possible." N.J.S.A. 9:6-8.49.
N.J.S.A. 9:6-8.70 does not define the term "final order." Therefore, we interpret the term "final order" in its ordinary *662 meaning as an order which disposes of "all issues as to all parties." Hudson v. Hudson, 36 N.J. 549, 553, 178 A.2d 202 (1962); CPC Int'l, Inc. v. Hartford Accident & Indem. Co., 316 N.J.Super. 351, 365, 720 A.2d 408 (App.Div.1998), certif. denied, 158 N.J. 73, 74, 726 A.2d 937 (1999). See also Pressler, Current N.J. Court Rules, comment 2 on R. 2:2-3 and comment on R. 2:2-4 (2003).
An examination of the statute indicates that an order finding that a child has been abused or neglected is an interlocutory order. The use of a two-step procedure and the legislative admonition to minimize adjournments and to grant priority to proceedings involving out-of-home placements of the child or children who are the subjects of the proceeding all indicate that the only final order is the order following the dispositional hearing.
There seems to be a general assumption that an appeal may be taken as of right from an order finding abuse and neglect, in spite of the procedure outlined by statute. See New Jersey Div. of Youth & Family Servs. v. J.T., supra, 354 N.J.Super. at 409-10, 807 A.2d 270. We have found no case which directly addresses the issue. Several cases in which we have reviewed findings of abuse and neglect have included dispositional orders which by their terms suggested something more than a temporary placement. For example, in New Jersey Div. of Youth & Family Servs. v. J.Y., 352 N.J.Super. 245, 800 A.2d 132 (App.Div.2002), an examination of the facts indicates that the appeal was taken from an order of disposition following a finding of abuse and neglect. Similarly, in New Jersey Div. of Youth & Family Servs. v. S.S., 275 N.J.Super. 173, 645 A.2d 1213 (App.Div.1994), an order continuing the child in the custody of her maternal grandparents had been entered following a finding that the child was at substantial risk of abuse, and the opinion does not suggest that further proceedings were contemplated.
The treatment of orders finding abuse and neglect as a final order may emanate from an appreciation of the impact such a finding may have on a family and permanency planning proposed by DYFS. It may be founded on experience which has revealed that dispositional hearings do not proceed as close in time to the fact-finding hearing as prescribed by the Legislature. By treating a finding of abuse and neglect as a final order, however, this court implicitly condones non-compliance with the scheme enacted by the Legislature requiring a final order as soon as possible after the removal of a child from her home. It is the function of the trial courts and this court to enforce, not subvert, a legislative scheme which emphasizes dispatch rather than delay in the disposition of allegations of abuse and neglect. A parent or guardian found to have abused or neglected a child, whose dispositional hearing is delayed, is not without relief. This court will be receptive to motions for leave to appeal in appropriate circumstances.
Here, the order following the fact-finding hearing is interlocutory. The May 9, 2002 order scheduled a "post-dispo" hearing for July 25, 2002. We were informed at oral argument, however, that the hearing was continued at that time and another hearing was scheduled for January 10, 2003.[4] The protracted nature of the post-finding proceedings and the grave impact the finding has had on this family militates that we consider this appeal on its merits. Therefore, we grant leave to appeal nunc pro tunc. *663 On the merits, we direct our attention initially to the issue of whether K.S.'s out-of-court statements to the DYFS worker were admissible. According to the DYFS worker, K.S. told her that L.A. had called R.S. and told him that J.M. would be at her apartment so R.S. could collect a debt owed to him by J.M. Furthermore, K.S. told the DYFS worker that L.A. took the infant, S.A., to visit R.S.
In matters involving the alleged abuse and neglect of children, the New Jersey Rules of Evidence are supplemented by statute and court rule. N.J.S.A. 9:6-8.46a(4) provides that "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." DYFS argues that K.S.'s statement that her mother called R.S. to the house on January 11 was corroborated by J.M.'s acknowledgment of a debt. Alternatively, DYFS contends the corroboration is unnecessary because the trial judge did not base any finding on K.S.'s statement. The record, however, fails to support either argument.
Recently, this court emphasized that "[t]he fact-finding hearing is a critical element of the abuse and neglect process." New Jersey Div. of Youth & Family Servs. v. J.Y., supra, 352 N.J.Super. at 264-65, 800 A.2d 132. A finding of abuse or neglect has a profound impact on a family. Ibid. Therefore, it is paramount that any finding must be based on competent reliable evidence. Ibid. The most effective types of corroborative evidence may be eyewitness testimony, a confession, an admission or medical or scientific evidence. However, corroborative evidence need not relate directly to the accused. By its nature, corroborative evidence "need only provide support for the out-of-court statements." New Jersey Div. of Youth & Family Servs. v. Z.P.R., 351 N.J.Super. 427, 436, 798 A.2d 673 (App.Div.2002). In Z.P.R., we held that evidence of age inappropriate sexual behavior could provide the necessary corroboration for a child's statements of sexual conduct towards him by his mother. Ibid.
K.S. told the DYFS worker two things: first, that her mother told R.S. to come to her house on January 11 so he could collect a debt from J.M., and second, that her mother had taken S.A. to see R.S. There is no evidence of any kind to corroborate K.S.'s statement that L.A. took the infant to see R.S. It is undisputed that there is no evidence that K.S. had been in R.S.'s presence at any time between her return to her mother in April 2001 and January 11, 2002. Thus, she had no personal knowledge of any visit. This portion of K.S.'s statement was inadmissible.
At the fact-finding hearing, J.M. testified that he had borrowed money from R.S. but had repaid the debt. The trial judge found the acknowledgment of the debt corroborated K.S.'s statement to the DYFS worker that L.A. had told R.S. to come to the apartment on January 11. DYFS concedes there is no other evidence to corroborate K.S.'s statement.
Although corroborative evidence need only provide support for the out-of-court statement, J.M.'s acknowledgment of a debt is too indirect to provide the necessary support to admit K.S.'s out-of-court statement. Furthermore, J.M. testified that the debt had been repaid well before January 11. Curiously, the trial judge found that J.M. was a credible witness in all respects. If the debt was repaid, repayment of a debt could not be the reason for R.S.'s presence on that day. Furthermore, J.M. testified that he was with L.A. the entire evening and did not see her use the telephone. In short, the record provides *664 no credible corroborative evidence of K.S.'s statements. Therefore, the precondition to the admission of this testimony did not exist and the statement was inadmissible.
DYFS contends that the trial judge did not base any finding on K.S.'s uncorroborated statement. The opinion rendered by the trial judge plainly contradicts this contention. Admittedly, the trial judge stated in the beginning of her opinion that there was insufficient evidence to find that L.A. had called R.S. to her home on January 11. However, by the close of the opinion, the judge found that K.S. was a credible witness and that L.A. had called R.S. to her home and had taken S.A. to visit him in direct violation of the prior orders entered in this matter. We cannot discount these findings.
Of further concern is the failure of the trial judge to interview K.S. Rule 5:12-4 allows for the testimony of a child to be taken privately in chambers or under other measures necessary to protect the child. A judge may also order that the child not be present at the hearing unless the child's testimony is necessary for the determination of the matter. Here, the attorney for the mother requested an in camera hearing. The judge held that the child had been interviewed by experts twice and a court interview would be too traumatic.
Trial judges have broad discretion in abuse and neglect cases, as well as custody and visitation matters untainted by an allegation of abuse or neglect, to conduct a private examination of a child. New Jersey Div. of Youth & Family Servs. v. S.S., 185 N.J.Super. 3, 7, 447 A.2d 183 (App.Div.), certif. denied, 91 N.J. 572, 453 A.2d 883 (1982). The purpose of a private interview with the child is to afford the trier of fact the opportunity to assess the credibility of the child, their powers of communication and observation, and their demeanor. Ibid.
Here, however, the trial judge mistakenly exercised her discretion to rely solely on the reports of DYFS workers. K.S. was twelve years old on January 11. We have not been informed when the sexual assault occurred, although we can surmise that it occurred in late 2000 in light of the January 2001 order barring R.S. from the house and any contact with his children. We do not minimize the trauma the assault, the subsequent removal and return to her mother, and the January 2002 removal from her mother may have had on K.S. Nevertheless, she is not an infant and is capable of providing testimony not only of the events of January 11 but also whether she feels safe in the custody of her mother. The trial judge found that a private interview would be traumatic to the child, that she was a credible witness and that she was also partial to her mother. Without meeting the child, these findings are pure speculation.
Therefore, we remand this matter for further proceedings, at which time K.S. should testify under such conditions as are in her best interest. R. 5:12-4(b). K.S. should be able to offer testimony about not only the events of January 11 but also who should have custody of her. We do not mean to suggest that K.S.'s opinion about where and with whom she will live should be dispositive. However, K.S. is now thirteen and is able to express a preference and concerns regarding custodial arrangements. Mackowski v. Mackowski, 317 N.J.Super. 8, 12-13, 721 A.2d 12 (App.Div. 1998). If she feels safe and secure in her mother's care, she should be able to express that opinion and the reasons for the opinion directly to the trial judge. Conversely, if she feels insecure or is ambivalent about her custodial arrangement, she should have the opportunity to say so.
*665 The interview with K.S. is critical because, with her prior statement excluded, the finding of abuse and neglect is thinly supported. Even more thinly supported is the order to continue the out-of-home placement of the children pending a dispositional hearing. Due to the exclusion of any reference to the initial abuse and neglect proceeding, other than the fact that K.S. had been sexually assaulted by R.S. and the entry of an order forbidding contact between R.S. and K.S., the facts provide slim support for not only the finding of abuse or neglect but also the continuation of the out-of-home placement of the children. The January 2002 incident is a single encounter which occurred nine months following K.S.'s return to the custody of her mother in April 2001. We recognize that the dispositional hearing has not concluded. We also recognize that L.A. appeals only from the order finding that she had abused or neglected her children on January 11, 2002, and the days thereafter by her failure to report the incident to DYFS or to seek to enforce the no contact order. However, the initial accusation by DYFS and the finding by the court serve as the factual predicate to the removal of the children from L.A.'s custody and the continuation of the out-of-home placement. It is impossible to segregate cause and effect in this instance.
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] The complaint refers to S.A. as S.S., but the fact-finding order and the notice of appeal identify this child as S.A. For purposes of this opinion, we will use the initials S.A.
[2] The record does not disclose whether criminal charges were filed against R.S. and, if so, whether bail has been established. We can surmise that by entering a restraining order on January 2, 2001, R.S. had not been charged at that time, or had been charged but was free on bail, or was about to be released on bail.
[3] We have not been provided with this order but have been provided with a January 2, 2001 order which provides that K.S. shall be returned to the custody of L.A. The order also states "no contact w/Paul S.-Paul S. shall not have any contact w/her baby." R.S. is also known as Paul S.
[4] Ordinarily, a notice of appeal operates to stay all proceedings in the trial court. R. 2:9-1(a). We have not located any order allowing the hearing to proceed in this matter.