# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3060-17T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.B. and N.P.,

     Defendants,

and

A.L.,

     Defendant-Appellant.

_____

IN THE MATTER OF A.P., N.P.,
A.L., and J.L.,

     Minors.

_____

Submitted January 24, 2019 – Decided February 13, 2019

Before Judges Reisner and Mawla.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, Docket No. FN-06-0019-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Beth A. Hahn, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Nancy R. Andre, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Nancy P. Fratz, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant A.L. appeals from a February 1, 2018 order finding he committed abuse by exposing A.P. to emotional harm by perpetrating domestic violence against A.B. the child's mother. We affirm.

The following facts are taken from the record of the fact-finding hearing. A.L. and A.B. are the parents of twins who were almost two years of age in July 2017, when the underlying incident occurred. A.B. is the mother of A.P. and N.P., who were nine and five years of age at the time. A.L. and A.B. have a history of domestic violence. Multiple restraining orders were filed by A.B. against A.L. in May, August, and September 2015, and May 2016, all of which she either voluntarily dismissed or failed to prosecute.

2

The Division of Child Protection and Permanency (Division) first became involved with the parties in January 2017, when it received a referral relating to another domestic violence dispute. A.L. had allegedly smashed A.B.'s car window with a baseball bat because he was denied access to his children. On July 14, 2017, the Division received a second referral from the Millville Police Department involving another incident of domestic violence, where it learned A.L. had again broken a car window. Division caseworkers and police responded to the parties' residence, but no one answered the door.

The following day, when Division caseworkers returned to the residence, they noticed broken glass on the road in front of the parties' home. Later that day, A.L. contacted police and disclosed he was in the children's bedroom when police arrived the previous night, but did not answer the door because of outstanding arrest warrants. The police also advised the Division A.B. had packed her belongings and moved out of the home in the morning.

Division caseworkers interviewed A.B., her parents, A.L., and the two children, A.P. and N.P. The Division learned A.L. was unemployed, had repeatedly asked A.B. for money, and the incident the night before was the result of an argument over money. According to A.B., when she refused to give A.L. money, he took a hammer and smashed the driver-side window of her car. A.B.

also reported that A.P. had witnessed the incident. A.B. called the police, but by the time they arrived, A.L. had left the home. After the police left, A.L. returned and A.B. told him she was taking A.P. to her mother's house. When A.B. tried to leave the following morning, A.L. prevented her from doing so by also sitting in her car, but ultimately relented.

A.B. also informed Division caseworkers that A.L. had threatened to take the two youngest children on previous occasions and told her he would kill her if she ever left him. A.B. denied physical abuse by A.L., but stated "he [would] get into her face and scream," and sometimes they would push each other during arguments.

On July 17, 2017, Division caseworker Shelbi Mossbrooks received a telephone call from A.L. claiming he intended to report alleged neglect by A.B. Mossbrooks explained the Division had a safety plan which required supervised visitation, and in order for A.L. to have contact with his children, the Division would have to interview him and assign him a supervisor for visits. A.L. admitted to Mossbrooks he had anger issues and could "use some help."

Mossbrooks and another caseworker interviewed A.L. at the Division office later in the day. A.L. claimed A.B. was unfit to have custody of the children and she was the one who hid him from the police the night before. He

denied threatening A.B. with a hammer and smashing her car windows, and denied a history of domestic violence.

On July 18, 2017, Mossbrooks received a phone call from A.L. seeking more information about his case. She informed him there was a temporary restraining order entered against him and he could have no contact with the children until the matter was addressed at the final restraining order hearing. A.L. told Mossbrooks he could not go to court because of the outstanding warrants. He repeated several times during the course of the call that the matter was about to end "real bad" and that he was taking the children.

Mossbrooks' supervisor, who was also on the telephone conference, informed A.L. the Division would be reporting his threats to law enforcement. A.L. repeated his threats and also threatened the supervisor. After the call, Mossbrooks conveyed A.L.'s threats to the police.

On July 19, 2017, Mossbrooks and another caseworker interviewed the nine-year-old, A.P. She had observed the fight between A.B. and A.L., which she believed was about her twin half-brothers. She saw A.L. kick down a bedroom door, take A.B.'s car keys, drive away, return, and then smash the driver's side window of A.B.'s car with a hammer he found in the house. A.P. then saw A.L. put the hammer to her mother's head, while she was holding one

A-3060-17T2

of the twins. A.P. knew that A.L. had previously smashed the passenger side window of her mother's car.

According to A.P., when A.L. learned police were coming to the residence, he attempted to take the child A.B. had been holding and escape. However, he returned the child to A.P. before running out of the house. A.P. was scared A.L. was going to run away with her brother. Her mother brought her to her grandmother's house after the incident, but she was worried for her mother because "more stuff was happening at the house while [A.P.] wasn't there." A.P. reported she nearly lost her voice from screaming from fear.

Although A.P. claimed she was not actually afraid of A.L., she stated she felt safer at her grandmother's home. A.P. also reported A.L. had smacked N.P. before and confronted the child for being disrespectful. She believed her mother feared A.L., because she gave him money in order to avoid violence and her mother would call 9-1-1 during arguments with A.L. During one incident, her mother was banging on the wall for help, but the neighbors could not hear her, so A.B. sent A.P. to a neighbor's house for help.

Mossbrooks and a caseworker also interviewed the five-year-old, N.P., who stated he did not feel safe at home around A.L. N.P. had seen A.L. clap his hands in his mother's face during fights. On another occasion, A.L. poured a

full bottle containing a sports drink onto A.B. while she was driving. N.P. also stated the police had come to the home because A.L. had kicked A.B. He did not intervene during arguments between A.L. and his mother because he was afraid. N.P.'s method of intervention during fights was to yell at A.L. and A.B. and "ask[] them to kiss each other."

On August 1, 2017, the Division filed an order to show cause and verified complaint for care and supervision of all four children. The court granted the application, accepted the safety protection plan suggested by the Division, and entered an order barring contact between A.L. and the children. A.L. neither appeared for the hearing, nor attended a scheduled appointment with an anger management therapist, despite having previously agreed to do so at the Division's request. On the return of the order to show cause, the judge noted a final restraining order had been entered against A.L. The judge continued the no contact order between A.L. and the children.

The trial judge conducted a fact-finding hearing. Mossbrooks and A.B. testified. The primary evidence for the hearing was Mossbrooks' investigation summary report. The judge admitted the report into evidence over A.L.'s objection that the report contained hearsay statements from non-testifying

witnesses. However, the judge ruled he would not consider the inadmissible hearsay in the report.

Relying on her report, Mossbrooks recounted the investigation and the facts as we have stated them. A.B. testified that A.P. witnessed the July 2017 confrontation between her and A.L., but denied a child was in her arms at the time or that A.P. intervened by attempting to take a child from A.L. She denied A.L. held a hammer to her head, but stated he held the hammer in his hand during the argument. She also confirmed A.L. had smashed her car window with the hammer during the incident and had done so before. A.B. claimed A.L. was not in a "rage of anger," but was merely upset. She insisted the argument was only "name calling."

A.B. denied A.L. had threatened to kill her if she ever left him, but revised her testimony when confronted with her statements to Division workers memorialized in Mossbrooks' report. She admitted A.L. had threatened her before, but not during the July 2017 incident. She also admitted A.L. had threatened to take the children, but not on that occasion. A.B. ultimately admitted there was a history of domestic violence and there had been several restraining orders between the parties.

The trial judge made oral findings. He found Mossbrooks was credible, but reached a different conclusion regarding A.B. He stated:

> [A.B.] testified. And I do note, [when she] was called, she was somewhat surprised, [and] not necessarily prepared to testify. And I found [her] testimony to not be entirely credible. I found [she was] . . . mitigating, she was explaining, she would answer rather succinctly. And then when there was a tough question on more than one occasion[] she paused as if searching for the answer. I find that she does have a status of being a victim of domestic violence, whether it's this incident or a past incident. And it is not . . . unusual for people to mitigate at trial. It's not unusual for people to engage in hyperbole when they're calling the police. So I'm not here to guess . . . which is the situation. I am not in the mind of a victim of domestic violence and I certainly have empathy and sympathy for [A.B.]. But I do find that her testimony was somewhat inconsistent and sputtered when she was . . . given tough questions. . . .
>
> I thought [the Division's] . . . direct examination was succinct. I thought the objections should not have really confused anyone but I find that [A.B.] gave confusing answers. And that's why I offered some leeway to clear up some of the potential misunderstanding. But I also found that — I watched [A.B.'s] demeanor change during her testimony. She was calm, answering questions that were more innocuous. But when she started getting challenged on the chain of events where the hammer was, the going upstairs, I noticed that [her] voice became louder and her tone became sharper as she was explaining her answer. And that's very important because that's part of my analysis as to her credibility or to some degree lack thereof. I do find that [A.B.] was mitigating . . .

here. However, there are some aspects of her testimony that I find credible.

Regarding the underlying incident, the judge concluded:

I do find there was an act that occurred between [A.L.] and [A.B.] on the date in question, . . . in the home, in the presence of [A.P.] and in the presence of the other children, to a degree. [A.P.] did witness . . . an act of domestic violence. . . . This is not an isolated incident. This is not two adults in the presence of a child having an argument. This is a repeated event and I find that it is corroborated, specifically, by the testimony of [A.B.]

There is a history of domestic violence in this house and I find that . . . has certainly been corroborated. That portion of [A.P.]'s statement, when she talks about the context of this happening before. I also find that [A.P.] gave a statement with enough specificity concerning her actually witness[ing] [A.L.] going to the car and smashing the car window with a hammer. That has been corroborated by the facts of this case, specifically [A.B.]'s testimony. Also corroborated was the detail that [A.P.] recalled that there was a prior incident. Again, corroborated by [A.B.]. So the [c]ourt has no reason to doubt when [A.P.] was precise enough as to which window. That it was actually a different window the previous time. So . . . there is a context, a pattern of credibility as to [A.P.]'s statement.

[A.P.] actually did witness [A.L.] take a hammer, the same hammer he had in his hand, that he followed [A.B.] up the stairs with, after he smashed the car window. [A.P.] actually witnessed [A.L.], smash that car window. [A.P.] also witnessed the police being called and coming to the house. [A.P.] also witnessed

10

[A.L.] departing the house prior to the police getting there. All of those I do find as fact. They are corroborated by the evidence.

The trial judge concluded A.P. had suffered emotional harm from witnessing the July 2017 incident and the history of domestic violence. The judge stated:

> I do not agree with the Division's assessment that this was a zone of danger issue because the hammer was not swung in the presence of any child. I have no evidence for that to make a finding. However, there are additional facts.
>
> . . . I find that in the context of everything that [A.P.] stated, in the context of the police being called, in the context of the history here . . . that [A.B.] is not being completely honest with the [c]ourt when she said [A.L.] was angry, not enraged. He had just smashed out a car window in a rage in front of at least one child. That child witnessed the rage, that child witnessed the hammer, that child witnessed this act of domestic violence carry over to where [A.L.] followed, while he was still in his angered state up the stairs to the point where [A.B.] felt it appropriate to call the police. . . . And I'm not making a finding . . . that the hammer was actually held to [A.B.]'s head. [A.B.] certainly disagreed with that. And there was no proof other than [A.P.] — but . . . [A.P.] witnessed enough. She . . . indicated that she was fearful for her little brother, that [A.L.] was going to take [him]. She was fearful for her mother. This is a young lady . . . who I find, by a preponderance of the evidence, was actually, emotionally harmed by this incident. . . . No child should have to witness this. This is not an isolated incident and . . . this nine year old expressed

11

concern. . . . I do find . . . that [A.P.] specifically denied [A.L.] hit her, pushed her or hurt her in any way. And she said she was not scared for herself . . . but she was scared for her sibling, her brother, and she was scared for her mother. . . . [T]he [c]ourt finds that it is reasonable to infer that this child has suffered some harm for being present and witnessing this. And despite what [A.B.] says, no one will smash out a car window with a hammer unless they were in a rage. In the context of this domestic violence, I do find that there was an act of domestic violence predicated on implied threats, chasing someone upstairs, continuing an argument in the context of smashing a window with a hammer. Which, under the law, under those circumstances, could very well be considered a deadly weapon. So for those reasons, I do find that this is an abuse and neglect case by a preponderance of the evidence.

The judge signed an order accordingly. The Title Nine litigation was dismissed and joint legal custody of the twins was awarded to both parents. The judge named A.B. the parent of primary residence and A.L. the parent of alternate residence. The order also required A.L.'s future contact with the children to be supervised by his mother. This appeal followed.

I.

"[W]e generally defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. R.D., 207

12

N.J. 88, 112 (2011) (quoting N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 396 (2009)). "Because of the Family Part's special jurisdiction and expertise in family matters, we accord particular deference to a Family Part judge's fact-finding." N.J. Div. of Youth & Family Servs. v. T.M., 399 N.J. Super. 453, 463 (App. Div. 2008) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)).

We must examine "whether there was sufficient credible evidence to support the trial court's findings." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342 (2010). "We will not overturn a family court's factfindings unless they are so 'wide of the mark' that our intervention is necessary to correct an injustice." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)).

A.L. argues the trial judge's findings were not supported by adequate, substantial, credible evidence of harm. He asserts the judge relied exclusively on A.P.'s statements contained in the investigation summary and there was no other proof to corroborate the emotional harm to A.P. A.L. alleges he was deprived of due process because he had no notice the judge would deviate from

the Division's "zone of danger" theory of the case, and instead find abuse by means of emotional harm.

## II.

"Abuse and neglect actions are controlled by the standards set forth in Title Nine of the New Jersey Statutes." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 31 (2011). Regarding "the quantum of proof required in a fact-finding hearing brought under Title Nine, see N.J.S.A. 9:6-8.44, it is well established that [the Division] must prove that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'" Id. at 32 (citation omitted) (quoting N.J.S.A. 9:6-8.46(b)).

The purpose of a fact-finding hearing is "to determine whether the child is [] abused or neglected[.]" N.J.S.A. 9:6-8.44. "[T]he safety of the child shall be of paramount concern[.]" N.J.S.A. 9:6-8.28(a), -8.31(a), -8.32. An "[a]bused or neglected child" includes a minor child

> whose physical, mental, or emotional condition has
> been impaired or is in imminent danger of becoming
> impaired as the result of the failure of his parent or
> guardian, as herein defined, to exercise a minimum
> degree of care . . . (b) in providing the child with proper
> supervision or guardianship, by unreasonably inflicting
> or allowing to be inflicted harm, or substantial risk
> thereof, including the infliction of excessive corporal

> punishment; or by any other acts of a similarly serious nature requiring the aid of the court[.]
>
> [N.J.S.A. 9:6-8.21(c).]

A court's abuse or neglect determination should account only for the objective circumstances surrounding the incident, not the parent or guardian's subjective intent. G.S. v. Dep't of Human Servs., 157 N.J. 161, 176 (1999) (explaining when "a parent or guardian commits an intentional act that has unintended consequences, that action is . . . within the meaning of Title 9.")

In making a finding of abuse or neglect, a court considers "the totality of the circumstances, since '[i]n child abuse and neglect cases the elements of proof are synergistically related. Each proven act of neglect has some effect on the [child]. One act may be "substantial" or the sum of many acts may be "substantial."'" N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 329-30 (App. Div. 2011) (alterations in original) (quoting N.J. Div. of Youth & Family Servs. v. C.H., 414 N.J. Super. 472, 481 (App. Div. 2010)).

In enacting the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35, the Legislature found "that 'children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence.'" N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 585 (App. Div. 2010) (quoting N.J.S.A. 2C:25-18). Nevertheless,

the court cannot take "judicial notice of the fact that domestic violence begets emotional distress or other psychic injury in child witnesses" and a legislative declaration is not a substitute for proofs submitted at a fact-finding hearing. N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J. Super. 13, 25 (App. Div. 2004).

"[T]he act of allowing a child to witness domestic violence does not equate to abuse or neglect of the child in the absence of additional proofs." I.H.C., 415 N.J. Super. at 584 (citing S.S., 372 N.J. Super. at 22–26).

> N.J.S.A. 9:6–8.46(a)(4) provides that "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect."
>
> [N.J. Div. of Youth & Family Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003).]

To establish corroboration of a child's statement under N.J.S.A. 9:6-8.46(a)(4), "[s]ome direct or circumstantial evidence beyond the child's statement itself is required." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 522 (App. Div. 2017). "The most effective types of corroborative evidence may be eyewitness testimony, a confession, an admission or medical or scientific evidence." L.A., 357 N.J. Super. at 166. "[A] parent or guardian's past conduct can be relevant and admissible in determining

16

risk of harm to the child." I.H.C., 415 N.J. Super. at 573. Moreover, "the risk, or pre-disposition, that a defendant may harm [a child] is expressly admissible in an abuse or neglect case despite the general evidentiary prohibition contained in N.J.R.E. 404(b)." Id. at 575–76.

"However, corroborative evidence need not relate directly to the accused." L.A., 357 N.J. Super. at 166. The evidence "need only provide support for the out-of-court statements." Ibid. (quoting N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App Div. 2002)). Corroborative evidence that is sufficient to support a court's reliance on a child's statements for a finding of abuse or neglect may be circumstantial because there is often no direct physical or testimonial evidence to support a child's statements. See Z.P.R., 351 N.J. Super. at 436.

In S.S., we held emotional harm to a child, based on the child witnessing domestic violence, must not be presumed. 372 N.J. Super. at 22-23. There, we reversed the trial court's finding of emotional harm where a mother was holding an infant child during a physical altercation perpetrated by her husband. Id. at 15, 28. We stated there were "evidential gaps," between the domestic violence and the trial judge's finding the mother had subjected the child to emotional harm as a result. Id. at 23, 26. We noted a lack of a causal link between the

17

domestic violence and a concomitant effect on the child's "willingness to socialize, or observations of excessive crying, aggression or passivity, clinging, separation anxiety, sleep disturbances or any other change in the child's behavior that could be associated . . . with stress, distress or emotional difficulty." Id. at 22. In contrast, in I.H.C., we upheld a trial court's finding of emotional harm where witness testimony demonstrated a link between the domestic violence and the emotional harm done to the children who witnessed it. 415 N.J. Super. at 584–85.

Here, the finding of emotional harm was supported by adequate and credible evidence. The investigation summary report prepared by Mossbrooks corroborated her testimony. The report drew upon statements from A.B., A.P., and A.L., which were admissible under various hearsay exceptions and N.J.S.A. 9:6-8.46(a)(4), as to the child's statements. Based on the Division's investigation, there was no credible dispute that the parties had a history of domestic violence, A.P. had witnessed past acts of domestic violence between A.L. and A.B, including the underlying incident, and the police responded to these instances.

With this as the background, the judge had no reason to disbelieve A.P.'s statements related to the underlying domestic violence incident. Indeed, A.L.

did not testify, and A.B.'s testimony acknowledged there had been an incident, while not credibly convincing the judge it was a mere contretemps.  Mitigation by victims of domestic violence is not unusual and we have upheld a trial judge's findings of abuse under similar circumstances.  See I.H.C., 415 N.J. Super. at 578-79.

The record corroborated A.P.'s statements regarding the severity of the incident, which caused her to nearly lose her voice from screaming and traumatized her to the point she felt safer at her grandmother's house.  The totality of the circumstances supported the child's narrative, namely, that A.L. smashed A.B.'s car window with a hammer and, in a rage, continued to argue with A.B. while holding a hammer to her head.

Finally, we reject A.L.'s contention he had no opportunity to prepare an adequate defense to the claims asserted against him.  The Division's complaint clearly set forth the allegations of abuse or neglect against him, and specifically pled the following: "The aforesaid child(ren) was/were abused and/or neglected in that . . . his/her/their parent(s) or guardian(s) inflicted or allowed to be inflicted upon such child(ren) . . . protracted impairment of . . . emotional health[.]"  Therefore, A.L.'s argument he was deprived of due process lacks sufficient merit to warrant further discussion.  R. 2:11-3(e)(1)(E).

A-3060-17T2

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3060-17T2