# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2180-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

J.S.,

     Defendant-Appellant,

and

A.C., A.P. and J.C.,

     Defendants.

_____

IN THE MATTER OF D.S.,
N.P., G.C., and M.B.,

     Minors.

_____

Submitted April 28, 2020 – Decided June 8, 2020

Before Judges Accurso, Gilson and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FN-02-0228-15.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Cecilia M.E. Lindenfelser, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Donna Sue Arons, Assistant Attorney General, of counsel; William Rodriguez, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Todd S. Wilson, Designated Counsel, on the brief).

PER CURIAM

In this Title Nine action, defendant J.S. appeals a fact-finding order, now final, that she abused or neglected three of her children: D.S. (Donald), born April 2007; N.P. (Neal), born May 2008; and G.C. (Gary), born October 2014, by violating a safety protection plan that prohibited contact between the children and Gary's father, (James).[1] Because we conclude there was sufficient credible evidence in the record supporting the family judge's decision, we affirm.

---

[1] We use pseudonyms for ease of reference. While the protective services action was pending, defendant gave birth to her fourth child, M.B., who is the biological daughter of James. Accordingly, no finding of abuse or neglect was made as to M.B., but she was included in the ensuing guardianship action. The

Judge Jane Gallina-Mecca conducted the two-day fact-finding hearing, at which the Division of Child Protection and Permanency presented the testimony of Neal's teacher, two caseworkers, two law enforcement officers, an expert in pediatrics and child abuse, and an expert in psychology. The Division also moved into evidence more than 500 documents, including its investigative reports, and the medical and psychological evaluations of Neal and Donald. Additionally, the video-recorded statement of Neal's interview with the Bergen County Prosecutor's Office (BCPO) was played at the hearing and admitted in evidence. Neither defendant nor James presented any evidence.

The judge's opinion, spanning fifty transcript pages, details the facts underpinning her conclusion that defendant and James abused or neglected the children. We incorporate her factual findings by reference, highlighting those that pertain to defendant.

School officials made the referral to the Division that led to the safety protection plan when Neal entered his kindergarten classroom on January 29, 2015, and his teacher noticed "a red mark" on the child's head. In response to his teacher's inquiry, Neal said he "hit his head on the bunk bed but that his back

judge found James abused or neglected Donald, Neal and Gary; James is not a party to this appeal. A.C. is Donald's father and A.P. is Neal's father; they are not parties to this appeal.

A-2180-18T2

was what was really hurting him." The teacher brought Neal to the school nurse's office, where she observed "bruises and marks down his spine." Neal said his stepfather, James, caused the injuries.

Neal provided additional details to the responding law enforcement officers, disclosing James "had pulled him by his shirt, dragged him out of the closet," which caused Neal to "bump[] his head on the bed." Donald said he did not see the incident but heard defendant yell at Neal "to get ready." Donald also volunteered that defendant hits the boys, employing "pow pow" when they don't listen. Defendant initially told the BCPO detective "she believed the injuries were caused by rough play between the two boys." She later acknowledged James "pulled [Neal] out of the closet" but she did not believe James purposely harmed Neal.

Later that day, James was arrested and charged with second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2). As a condition of bail, the judge prohibited James from any contact with Neal. When the Division notified defendant of James's arrest and explained the parameters of the no-contact order, defendant became visibly upset, claiming Neal "was lying" and James "did not cause the injury." The caseworker reprimanded defendant for making those statements in the children's presence. The following day,

4

defendant contacted the BCPO to request a second interview, advising Neal had "lied" and "recanted" his allegations against James. When reinterviewed by the BCPO detective, however, Neal's account remained the same.

Over the next few months, Neal and Donald were evaluated by the Division's experts. According to the psychologist who performed Neal's psychosocial evaluation, when asked whether defendant loved him, Neal replied: "No. She hates me. She says that. She doesn't love me. She loves my brothers." Neal stated his mother blamed him that James was "taken away" and "told [him] to lie about what happened or [he] will get taken away."

The expert noted "serious concerns" for Neal's safety "because his mother is calling him 'a liar' despite physical indicators of physical abuse as well as [Neal]'s disclosures of being dragged across the floor, hit by a belt, smacked, and hurt by [James]." Further, "[t]here are concerns regarding his feelings of rejection by his mother who he says hates him. [Neal] presented apprehensive, soft spoken and anxious. He is an emotionally vulnerable child who has been physically abused and psychologically maltreated."

Donald told the pediatric child abuse physician that Neal "lied about [his] dad and the closet." Donald admitted, however that James hit him with a belt,

including one time in the face, and reported he was angry with defendant "for not protecting him from being hit."

James was released from jail pending trial but the no-contact order remained in effect as to Neal. Defendant and James then signed a safety protection plan, prohibiting James from unsupervised contact with Donald and Gary. Two days later, on March 4, 2015, the Division received an anonymous referral that defendant "screams, curses, and smacks all of the children," and had hit Donald and Neal with a belt on their "bare bottoms." As part of that investigation, the Division conducted separate, unannounced interviews with Neal and Donald at their school.

Donald denied any physical abuse, but when asked whether James had visited the family's home, Donald said James "was at the house last night for dinner and this morning [James] was in his mother's room because [James] has court today." According to the Division worker's investigative report, Donald "stated he knows that [James] is in the house because he could hear his car outside. [Donald] indicated that [James] has a Mustang and his engine is loud." When directly asked whether James entered the home, Donald said, "yes, he could hear him talking downstairs on Sunday[]s when he comes over for dinner."

Donald told the worker "they have to stay upstairs when [James] comes over." Donald said James had been to the home on seven occasions.

Neal similarly denied recent physical abuse by defendant and corroborated Donald's account of the previous evening, stating James "was over the house for dinner last night." Neal said "he could hear [James] downstairs while he was upstairs but he did not see him. [Neal] explained that his mother told him he could not go downstairs. [The child] reported that he has seen [James] sleeping in his mother's room on several occasions . . . ." Neal then told the worker he "did not want to speak more about [James] because he felt he would get [James] in trouble."

Later that day, the Division removed Donald, Neal and Gary from the family's home. When asked whether James had been at the home the previous evening, defendant said James came by "to drop off money for [Gary] but then he left." Defendant denied James had stepped foot inside the home. On the return date of the order to show cause, the judge granted the Division's request for care and supervision of the children. The judge permitted defendant weekly, supervised visitation with all three children, but limited James's weekly supervised visitation to Gary.

Three weeks later, on April 2, 2015, defendant received a call from James during a visit with the children. James purportedly asked defendant whether he could drop off "something." The worker supervising visitation denied the request, informing defendant she could meet James outside, but he could not join the visit in light of the no-contact order with Donald and Neal. James nonetheless "came up to the visitor room" without "anything in his hand." A few weeks later, the visitation supervisor noted defendant "was very distant from [Neal]," requiring encouragement to engage with him.

In her comprehensive decision, Judge Gallina-Mecca carefully reviewed the testimony and evidence presented at the hearing. She found the testimony of all witnesses credible and the hearsay statements of Neal and Donald sufficiently corroborated by other evidence in the record. Accordingly, the judge concluded, "[b]ased upon the totality of the circumstances," the Division proved "by a preponderance of the competent, credible evidence" that defendant abused or neglected the children by placing them "at a substantial risk of injury . . . ."

Defendant now appeals. She argues the record is insufficient to establish abuse and neglect by a preponderance of the evidence. Defendant contends the children's claims that she violated the no-contact orders lack corroboration and

their accounts cannot serve to corroborate each other. She further contends the trial judge erred in finding she emotionally harmed the children or placed them at substantial risk of harm. We disagree.

Our limited standard of review of a family court's fact-finding determination is well settled. N.J. Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 112 (2011). On appeal from orders issued in Title Nine actions, we accord considerable deference to the trial court's credibility determinations and findings of fact when those findings are supported by adequate, substantial, and credible evidence. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 278-79 (2007). We maintain that deference "unless the trial court's findings went so wide of the mark that a mistake must have been made." Id. at 279 (citation omitted). Given a family court's special expertise in matters concerning children, we do not readily second-guess its factual findings. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014).

Applying that limited and well-settled scope of review, we affirm the trial court's finding of abuse and neglect, substantially for the sound reasons expressed by Judge Gallina-Mecca. We add the following comments.

Pertinent to this appeal, an "abused or neglected child" under Title Nine means a child under the age of eighteen

whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . .

[N.J.S.A. 9:6-8.21(c)(4)(b).]

It is not necessary to wait until a child is actually harmed or neglected before a court can act in the welfare of that minor. N.J. Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 178 (2015). "In the absence of actual harm, a finding of abuse and neglect can be based on proof of imminent danger and substantial risk of harm." N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 23 (2013) (citing N.J.S.A. 9:6-8.21(c)(4)(b)). "Any allegation of child neglect in which the conduct of the parent or caretaker does not cause actual harm is fact-sensitive and must be resolved on a case-by-case basis." E.D.-O., 223 N.J. at 192.

Our Supreme Court has explained a minimum degree of care is "conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S. v. Dep't of Human Servs., 157 N.J. 161, 178 (1999). A parent "fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk

of serious injury to that child." N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017) (quoting G.S., 157 N.J. at 181). "The focus in abuse and neglect matters . . . is on promptly protecting a child who has suffered harm or faces imminent danger." A.L., 213 N.J. at 18 (citing N.J.S.A. 9:6-8.21(c)(4)).

A court's finding of abuse or neglect must be based on a preponderance of the evidence when the proof is considered in its totality. N.J.S.A. 9:6-8.46(b)(1); N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 328-29 (App. Div. 2011). "In child abuse and neglect cases the elements of proof are synergistically related. Each proven act of neglect has some effect on the [child]. One act may be substantial or the sum of many acts may be substantial." N.J. Div. of Youth & Family Servs. v. C.M., 181 N.J. Super. 190, 201 (App. Div. 1981) (internal quotation marks omitted). Notably, the Title Nine proof standard is less stringent than the standard in guardianship cases for the termination of parental rights, which must instead be proven by clear and convincing evidence. See R.G., 217 N.J. at 554; N.J.S.A. 30:4C-15.1(a).

Under N.J.S.A. 9:6-8.46(a)(4), "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." Accordingly, "a child's hearsay

11

statement may be admitted into evidence, but may not be the sole basis for a finding of abuse or neglect." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 33 (2011).

Corroboration of a child's hearsay statement pursuant to N.J.S.A. 9:6-8.46(a)(4) requires "[s]ome direct or circumstantial evidence beyond the child's statement itself . . . ." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 522 (App. Div. 2017). We have observed the "most effective types of corroborative evidence may be eyewitness testimony, a confession, an admission or medical or scientific evidence." Id. at 521 (internal quotation marks omitted). "However, corroborative evidence need not relate directly to the accused[,]" but "need only provide support for the out-of-court statements." N.J. Div. of Youth & Family Servs. v. L.A., 357 N.J. Super. 155, 166-67 (App. Div. 2003) (internal quotation marks omitted).

The proofs adduced before Judge Gallina-Mecca sufficiently met those well-established standards. As the judge found, the Division proved, by a preponderance of the credible evidence, that defendant created a substantial risk harm to her children by violating the no-contact orders imposed by the Criminal Division and the Family Part. Contrary to defendant's argument, the judge did not impermissibly determine the children's statements were corroborated only

A-2180-18T2

by each other's. Rather, the judge correctly recognized Neal and Donald made separate and detailed statements to the unannounced Division worker, and those statements were independently corroborated by defendant's conduct and her admissions, and the children's psychosocial evaluations.

Regarding defendant's reaction to her children's disclosures, the judge recognized:

> [Defendant's] immediate response was not that the children were mistaken, but she complained that the children were spoken to without her permission. Notably, [defendant] admitted that [James] came to the house on the previous evening, although she maintained that it was for the purpose of dropping off money. She later also admitted to the Division that she needed help shoveling snow, and that was why [James] was in the house in violation of the court orders.

The judge also found defendant's conduct during visitation "[e]qually compelling corroborative evidence" that she violated the court orders. As one notable example, the judge cited the April 2 visit, finding defendant "orchestrated an encounter with the children under the guise that [James] needed to bring something to [her]." The judge also cited Neal's psychosocial evaluation, finding it supported his "psychological maltreatment" by defendant.

Concluding the evidence was "uncontroverted," the judge found defendant "ha[d] little regard for the orders that restrict[ed James]'s contact with the

13

children[,]" thereby placing them "at a substantial risk of harm by inviting impermissible contact with [James]." That risk was underscored by James's "particularly egregious acts of physical abuse," defendant's inability to protect her children from harm, and the resulting "hostile, abusive home environment." As the judge observed, defendant ignored Neal at visits, chose James "over her children," and failed to protect her sons from James's physical abuse. We therefore find no merit in defendant's argument that the Division failed to prove defendant emotionally harmed her sons or placed them at substantial risk of harm by violating the no-contact orders.

In sum, we are satisfied there was competent, credible evidence in the record to support the judge's finding that defendant abused or neglected her children. See N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 226 (2010). The totality of the circumstances cited by the judge support her conclusion that the children were abused or neglected within the meaning of N.J.S.A. 9:6-8.21(c)(4)(b).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION