# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1850-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

J.M.H.,

     Defendant-Appellant,

and

M.A.,

     Defendant.

_____

IN THE MATTER OF
A.A. and J.V., minors.

_____

Submitted May 29, 2024 – Decided September 16, 2024

Before Judges Gooden Brown and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0092-22.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Laura M. Kalik, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Julie B. Colonna, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minor A.A. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant J.M.H.[1] appeals from a June 22, 2022, Family Part order entered following a fact-finding hearing. In the order, the trial judge determined defendant abused her then fifteen-year-old daughter, A.A., within the meaning of N.J.S.A. 9:6-8.21(c), by inflicting excessive corporal punishment during a physical altercation. The order was perfected for appeal by order entered on January 10, 2023, terminating the litigation. Both the Division of Child Protection and Permanency (Division) and the Law Guardian urge us to reject

---

[1] We use initials to protect the privacy of the family. R. 1:38-3(d)(12).

defendant's arguments and affirm the judge's decision. Based on our thorough review of the record and the governing legal principles, we affirm.

I.

A.A., born 2006, is the biological child of defendant and M.A. Defendant is the parent of primary residence. A.A.'s half-brother, J.V., born 2012, is the biological child of defendant and another individual who is not a party to this appeal. J.V. also resided with defendant and A.A. No findings were entered concerning M.A. or J.V.

On January 11, 2022, the Division initiated a child abuse investigation of defendant based on a referral by M.A. that A.A. had been "physically abused" by her mother. Division investigator Jocelyn James responded and interviewed A.A. and others. Following the interviews, A.A. was temporarily placed with defendant's sister pursuant to a family agreement. However, when defendant attempted to pick up A.A. at school in violation of the agreement, the Division executed an emergency Dodd removal[2] of A.A., and, two days later, on January 28, 2022, filed an order to show cause and verified complaint, seeking custody,

---

[2] A Dodd removal refers to the emergent removal of a child without a court order when the child's life or health is in imminent danger under L. 1974, c. 119, § 9 (codified as amended at N.J.S.A. 9:6-8.29).

care, and supervision of A.A. under Title 30, and adjudication of abuse allegations against defendant under Title 9.

At the fact-finding hearing conducted on June 22, 2022, the Division produced James as its sole witness, and defendant produced her domestic partner, D.R., who had been in a relationship with defendant for two-and-one-half years and stayed at defendant's home "three to four days a week." At the hearing, James testified that on January 11, 2022, the Division received a referral reporting that A.A. "was being hit" by defendant and that A.A. had surreptitiously left defendant's home and gone to her father's house because she was afraid of defendant. According to the referral, defendant "kicked" and "choked" A.A. "[b]ecause she did not do her chores in the home."

James responded to M.A.'s house in Paterson the afternoon of January 11, 2022, along with members of the Paterson Police Department. James questioned A.A. who told her that three days earlier, on January 8, 2022, defendant "was upset" when she saw that A.A. had not "complete[d] [her] chores in a timely manner." A.A. said her chores consisted of washing the dishes and feeding the dogs. Defendant reportedly had several dogs and they adhered to a strict dietary regimen.

A-1850-22

A.A. told James that once defendant discovered she had not completed her chores, defendant began to berate, "[k]ick[]," and "choke[]" her. A.A. indicated to James that J.V. was present when defendant "started yelling," but then "went into his bedroom." When James inquired whether A.A. sustained any injuries, A.A. stated there was a mark on her neck from defendant choking her with both hands. James took three photographs of the marks on A.A.'s neck, which were admitted into evidence without objection.

A.A. also told James it "was not the first time" that "her mother had hit her." James confirmed that there had been "a previous referral in August of 2021 for physical abuse." James testified that she had also responded to that earlier referral and had interviewed A.A. and J.V., both of whom had denied the allegation. At the time, A.A. had explained to James that her mother had yelled at her for sneaking out of the house to see her boyfriend but had not physically disciplined her. However, A.A. now told James that she had lied to her during the prior investigation because defendant had informed her and her brother that if they did not deny being hit, the Division would remove them from the home.[3]

---

[3] During the August 2021 investigation, defendant had explained to James that she was strict on A.A. because she did not want her to get pregnant at age fifteen the way she had.

James further testified that while at M.A.'s house on January 11, 2022, she interviewed defendant who was also present. In response to James' questions about the incident, defendant denied "choking" A.A. and "stated that she was unaware of how [A.A.] received the marks" because defendant "had been in bed sick with a temperature of 104 [degrees] for the three days prior." Defendant expressly denied using corporal punishment on her children "in the past" and explained that she punished them by confiscating items "such as the television," "cell phone," and "video games." According to James, because defendant was "yelling," "screaming," and visibly upset during the interview, one of the police officers had "to move her away to try to calm her down."

As the interview continued, defendant explained to James that a Temporary Restraining Order (TRO) existed precluding contact between A.A. and M.A. and his parents. After confirming the TRO's existence,[4] James informed A.A. that she had to return home with her mother because she "could not be . . . with her father or grandparent" under the restraining order. In response, "[A.A.] started shaking and crying, indicating that she was fearful of [defendant]" and that "[s]he didn't want to go back" out of fear that "she would be beat[en] badly." As a result, with the family's agreement, A.A. was

_____

[4] M.A. had not been previously served with the TRO.

A-1850-22

temporarily placed with her maternal aunt. However, about two weeks later, when defendant attempted "to pick [A.A.] up" from school "to take her back home," and "[A.A.] continued to state that she was fearful of her mom," the Division completed a Dodd removal on January 26, 2022.

During the course of the investigation, James interviewed J.V. about the January 8, 2022, incident. Consistent with A.A.'s account, J.V. reported that "when his mom came in, his mom . . . start[ed] to yell at [A.A.]" because she "did not complete her chores in time." J.V. said "[h]e did not want to hear the yelling, so he went into his bedroom." J.V. also told James that A.A. and defendant would "yell at each other often," that he "s[aw] [defendant] hit [A.A.] in the past," and that "[defendant] had . . . hit him in the past" as well but never with an object. J.V. added that he would sometimes "cover" for A.A. by doing her chores to avoid a confrontation with defendant.

James confirmed that M.A. had made the referral to the Division on January 11, 2022, after A.A. had notified him about the incident.[5] In response, M.A. had arranged for his girlfriend to pick A.A. up from defendant's house at about 4:00 a.m. that morning without defendant's knowledge or consent. M.A. had also arranged for A.A. to be examined by her pediatrician the same day.

---

[5] M.A. had also made the referral the year prior.

The pediatrician subsequently reported to the Division that "the mark on [A.A.'s] neck [was] consistent with choking" and "with physical abuse." At the Division's request, the pediatrician also completed a report on January 14, 2022, indicating that "as per patient," A.A. had been "physically abused by [defendant]."

D.R. testified at the hearing on defendant's behalf. Although D.R. was in the master bedroom he shared with defendant at the time in question and did not actually witness the incident, he heard the screaming. He testified that on January 8, 2022, he "was taking care of [defendant]" because "[s]he had a high fever." According to D.R.,

> [o]n that night, [defendant] was thirsty, so she went to the kitchen. And she noticed that there was an unwashed pot that's been sitting there since Thursday. She called [A.A.] into the kitchen and asked her, isn't this the pot that you told me you washed? [A.A.]'s response was, it wasn't my turn to wash the dishes.
>
> So, [defendant] tells her now, she says, you're trying to be slick. Every day is your day to do the dishes, so start washing this pot right now. I could hear from my room that she's still telling her that, that's nasty. That you don't leave a pot unwashed for a couple of days. That it molds up.
>
> And out of nowhere I hear [defendant] say go ahead, go ahead, hit me, hit me. So, I get up and I walk to the kitchen. And when I walk into the kitchen I just

see [A.A.] with her fist clenched, just face to face with her mother.

. . . .

[A.A.] looked at me, and then looked back at her mom, and she, like, unclenched her hand, and noticed that she was in the wrong, and just kept saying, but it's not fair. It's not my turn to do the dishes. And [defendant] just tells her, I don't want to hear it. Go to your room. And sent her to her room. And then we also go to our room.

D.R. testified that A.A.'s voice did not sound "hoarse" and she did not "complain" "about her neck." Rather, "[s]he just sounded frustrated" and "yell[ed] that it[ was] not fair that she ha[d] to do the dishes every day." D.R. explained that over the course of his relationship with defendant, he had never "seen bruises" or "a busted lip" on A.A. or J.V. The only physical discipline he witnessed was "[a]bout two years ago, during the pandemic, . . . where [defendant] spanked [A.A.], because [A.A.] was being overly absent, saying that she's getting up for school, but she wasn't even logging into the laptop." D.R. clarified that "spanking" to him meant "one or two slaps on the butt."

D.R. also testified that the only ones present at the house when the incident occurred were defendant, A.A., and himself. According to D.R., J.V. was not home but at his grandmother's house. During an interview, defendant had also

told James that J.V. was at his grandmother's house the weekend the incident occurred.

After making detailed findings of fact and recounting the governing legal principles, in an order and oral opinion, the judge concluded that the Division met its burden of proof by a preponderance of the evidence. The judge determined that although "in many respects" defendant was "a very good parent,"[6] she "failed to exercise a minimum degree of care" by using "excessive corporal punishment" on A.A. on January 8, 2022, within the meaning of N.J.S.A. 9:6-8.21(c)(4)(b).

The judge first acknowledged that defendant had cared for both children with "no history with the Division" prior to the August 2021 referral, that was ruled "unfounded," and the January 8, 2022, incident "which is really the focus of the complaint that was filed." The judge found that D.R. was "a critical witness" and a credible witness because "[h]e hear[d] th[e] oral altercation going on in the kitchen," "th[e] screaming," and "[h]e . . . respond[ed] from the master bedroom to the kitchen."

The judge continued:

---

[6] It was undisputed that while in her care, the children did well in school and the home was properly maintained.

> [Defendant and A.A. a]re in the kitchen. Almost undisputed. [Defendant] is screaming, hollering, yelling loudly. Almost undisputed. And [A.A.] is being disrespectful. A potential adjective. Defiant, potentially. Not being completely forthright or honest. Maybe even lying to her mother. And her mother becomes more and more upset. The situation escalates.

The judge found that D.R.'s account corroborated A.A.'s account by confirming that she was in the kitchen, and that her mother was yelling at her "about a pot or a pan not being washed by her." The judge explained that although D.R. did not witness defendant kicking and choking A.A. as she claimed, he did witness A.A. "with a clenched fist" and he heard defendant say, "go ahead and punch me." Considering the totality of the evidence, the judge found it was "logical" and "reasonable" that A.A.'s "stance" was a response "to an attack" by defendant as A.A. had described. Although the judge acknowledged that A.A. "may very well" have "deserved some form of . . . punishment," nevertheless, defendant used "excessive corporal punishment" under the circumstances when she "engage[d] in some form of strangulation, where [she] put [her] hands around the neck of another human being."

The judge further determined that although there was "no scientific or medical testimony," James's demonstration of A.A.'s description of defendant choking her from "a lay person's perspective," "where the thumbs would be in

11

the front of the neck, and the four other fingers would be near the rear portion of the neck," was "consistent" with the "discoloration, bruising, [or] contusion" observed and photographed by James, and consistent with the pediatrician's examination on January 11, 2022. Thus, the judge concluded that A.A.'s statement was also corroborated by the Division's investigation. Critically, the judge pointed out that D.R.'s testimony "contradict[ed]" defendant's "statement that she ha[d] never used physical . . . punishment" on the children because "he personally witnessed her physically discipline [A.A.] on one occasion." Likewise, J.V. acknowledged that defendant had hit both children in the past. Although the judge acknowledged that corporal punishment was "acceptable when proportionate to the incident . . . being corrected," excessive corporal punishment was never acceptable.

Following the hearing, defendant indicated that she wanted to repair her relationship with her daughter and was compliant with services. Ultimately, the judge granted defendant joint legal custody of A.A. but continued temporary physical custody with M.A., who had reunified with his daughter. This appeal followed.

On appeal, defendant raises the following points for our consideration:

[POINT I]

12

THE ALLEGATION THAT [A.A.] WAS PHYSICALLY ABUSED BY [DEFENDANT] WAS AN OUT-OF-COURT STATEMENT BY A CHILD WHICH WAS NOT SUFFICIENTLY CORROBORATED AND THEREFORE COULD NOT FORM THE BASIS FOR A FINDING OF ABUSE OR NEGLECT UNDER TITLE 9.

[POINT II]

THE RECORD DOES NOT CONTAIN SUBSTANTIAL CREDIBLE EVIDENCE [T]HAT THIS ISOLATED INCIDENT OF A PARENT SCOLDING A DISOBEDIENT TEENAGER WAS EXCESSIVE OR CONSTITUTED A FAILURE TO EXERCISE A MINIMUM DEGREE OF CARE.

[POINT III]

THE TRIAL COURT FAILED TO CONSIDER SIGNIFICANT MITIGATING FACTORS.

[POINT IV]

IN ORDER FOR [THE DIVISION] TO PROVE ALLEGATIONS SO INEXTRICABLY DEPENDENT UPON A FIFTEEN-YEAR-OLD CHILD'S CREDIBILTY, [A.A.]'S TESTIMONY WAS REQUIRED AND THEREFORE THE PROCEEDINGS VIOLATED [DEFENDANT]'S DUE PROCESS RIGHTS[.] (NOT RAISED BELOW).

A. [A.A.]'s In-Court Testimony Was Necessary To Preserve The Defense's Right To Confrontation In This Quasi-Criminal Matter.

B. As An Alternative, In Camera Testimony Was A Sufficiently Non-Invasive Measure That

13

Would Have Afforded The Defense Some Measure Of Confrontation.

II.

We begin with a recitation of the governing principles. "The fact-finding hearing is a critical element of the abuse and neglect process . . . ." N.J. Div. of Youth & Fam. Servs. v. P.C., 439 N.J. Super. 404, 413 (App. Div. 2015). "The prevailing concern in abuse and neglect cases is the best interests of the child." N.J. Div. of Child Prot. & Permanency v. S.G., 448 N.J. Super. 135, 146 (App. Div. 2016). To succeed in a Title 9 fact-finding proceeding, the Division must prove "that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'" N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)).

An "abused or neglected child" is, in relevant part, a child under eighteen,

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment . . . .

> [N.J.S.A. 9:6-8.21(c)(4)(b).]

14

A parent's failure to exercise a minimum degree of care "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." Dep't of Child. & Fams. v. T.B., 207 N.J. 294, 300 (2011) (quoting G.S. v. Dep't of Human Servs., 157 N.J. 161, 178 (1999)). Willful or wanton negligence "implies that a person has acted with reckless disregard for the safety of others." G.S., 157 N.J. at 179. It is "done with the knowledge that injury is likely to, or probably will, result," and "can apply to situations ranging from 'slight inadvertence to malicious purpose to inflict injury.'" Id. at 178 (quoting McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305 (1970)). "However, if the act or omission is intentionally done, 'whether the actor actually recognizes the highly dangerous character of [the] conduct is irrelevant,' and '[k]nowledge will be imputed to the actor.'" S.G., 448 N.J. Super. at 144 (second alteration in original) (quoting G.S., 157 N.J. at 178).

"Because the primary focus is the protection of children, 'the culpability of parental conduct' is not relevant." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 344 (2010) (quoting G.S., 157 N.J. at 177).

> "Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation." G.S., 157 N.J. at 181-82. "When a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condition impaired, that

guardian has failed to exercise a minimum degree of care as a matter of law." Id. at 182. The mere lack of actual harm to the child is irrelevant, as "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999) (citation omitted).

[S.G., 448 N.J. Super. at 144-45 (alteration in original).]

When evaluating parental abuse and neglect appeals, "our standard of review is narrow." Id. at 142.

We will uphold a trial judge's fact-findings if they are "supported by adequate, substantial, and credible evidence." [N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)]. We "accord deference to fact[-]findings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." [N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012)].

. . . No deference is given to the court's legal conclusions which are reviewed de novo. N.J. Div. of Child Prot. & Permanency v. K.G., 445 N.J. Super. 324, 342 (App. Div. 2016).

[N.J. Div. of Child Prot. & Permanency v. B.H., 460 N.J. Super. 212, 218 (App. Div. 2019) (second alteration in original).]

If the trial court's rulings "'essentially involved the application of legal principles and did not turn upon contested issues of witness credibility,' we

16

review the court's corroboration determination de novo." N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 156 (App. Div. 2018) (quoting N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017)). Still, "[o]nly when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene . . . to ensure that there is not a denial of justice." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)).

Applying these principles, we see no basis to intervene. Contrary to defendant's assertions, the judge's factual findings are supported by substantial credible evidence in the record and the judge's legal conclusions are sound. In making a finding of abuse or neglect, a court considers "the totality of the circumstances, since '[i]n child abuse and neglect cases the elements of proof are synergistically related.'" N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011) (alteration in original) (quoting Dep't of Child. & Fams. v. C.H., 414 N.J. Super. 472, 481 (App. Div. 2010)). Here, based on the judge's credibility assessments and legal conclusions, the record is clear that defendant inflicted excessive corporal punishment on A.A. within the meaning of N.J.S.A. 9:6-8.21(c)(4)(b). The judge recounted in great detail A.A.'s account

of the incident as provided to James and aptly found that her statement was amply corroborated.

Defendant argues that the judge erred by basing his finding of abuse on the out-of-court statement of A.A. because there was insufficient corroborative evidence to establish its reliability. For the first time on appeal, defendant also asserts that not subjecting A.A. to "the rigors of cross-examination" violated defendant's due process rights. According to defendant, at the very least, A.A. should have been examined in-camera pursuant to Rule 5:12-4(b), which "allows for the testimony of a child to be taken privately in chambers or under other measures necessary to protect the child." N.J. Div. of Youth & Fam. Servs. v. L.A., 357 N.J. Super. 155, 168 (App. Div. 2003).

In Title 9 proceedings, a child's hearsay statements "relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." N.J.S.A. 9:6-8.46(a)(4). The statute "constitutes a statutorily created exception to the hearsay rule but independent evidence of corroboration is required in order to find abuse or neglect." N.B., 452 N.J. Super. at 522. We review de novo a court's determination that a child's

18

hearsay statements have been sufficiently corroborated under N.J.S.A. 9:6-8.46(a)(4). A.D., 455 N.J. Super. at 156.

"The most effective types of corroborative evidence may be eyewitness testimony, a confession, an admission or medical or scientific evidence." Id. at 157 (quoting L.A., 357 N.J. Super. at 166). Still, "corroborative evidence 'need only provide support for the out-of-court statements,'" L.A., 357 N.J. Super. at 166 (quoting N.J. Div. of Youth & Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002)), and such evidence may be circumstantial, N.B., 452 N.J. Super. at 522. Physical evidence of abuse itself may also be corroborative. See Z.P.R., 351 N.J. Super. at 436. Nevertheless, "courts must protect against conflating a statement's reliability with corroboration," and "consistency alone does not constitute corroboration." N.B., 452 N.J. Super. at 522-23.

Here, we agree with the judge that the Division's investigation, which included James's observations and photographs of the marks on A.A.'s neck as well as the pediatrician's January 11, 2022, examination and subsequent report, provided ample corroborative evidence. Additionally, as the judge painstakingly pointed out, even more compelling corroborative evidence was provided through D.R.'s testimony detailing what he heard during the encounter and what he observed immediately thereafter. As to defendant's belated

confrontation claim, we decline to consider it because it was not presented to the trial judge when there was an opportunity to do so, is not jurisdictional in nature, and does not substantially implicate the public interest.  See M.C. III, 201 N.J. at 339 (explaining that our courts "have often stated that issues not raised below will ordinarily not be considered on appeal unless they are jurisdictional in nature or substantially implicate the public interest").

We also reject defendant's contentions that the evidence did not support a finding of excessive corporal punishment within the meaning of the statute and that the judge failed to consider mitigating factors similar to those present in Dep't of Child. & Fams. v. K.A., 413 N.J. Super. 504 (App. Div. 2010).  Some injuries to a child are sufficiently egregious to warrant a per se finding of excessive corporal punishment.  See id. at 511-12.  These injuries typically require "medical intervention," such as "a fracture of a limb, or a serious laceration."  Id. at 511.  Where, as here, a per se injury is not present, the court must scrutinize the surrounding circumstances.  See P.W.R., 205 N.J. at 33.  Consideration must be given to the "nature and extent of the injuries" and the "instrumentalities used to inflict them."  N.J. Div. of Youth & Fam. Servs. v. S.H., 439 N.J. Super. 137, 146 (App. Div. 2015).

"[A]bsent evidence showing that the inflicted injury constitutes per se excessive corporal punishment, we must examine the circumstances facing [the parent] to determine whether striking [the child] . . . amounted to excessive corporal punishment." K.A., 413 N.J. Super. at 512 (emphasis omitted). In making the evaluation, we consider the "reasons underlying" the parent's actions, the "isolation of the incident," and any "trying circumstances" the parent was undergoing. Ibid. The age of the child is also an important factor. "[F]or example, one ought not assume that what may be 'excessive' corporal punishment for a younger child must also constitute unreasonable infliction of harm, or excessive corporal punishment in another setting involving an older child." P.W.R., 205 N.J. at 33.

Here, although the judge acknowledged A.A.'s attempted deception and defiance of her mother's orders and lauded defendant's otherwise effective parenting, the surrounding circumstances did not mitigate, explain, or justify defendant's actions. As the judge pointed out, the incident was not isolated given the August 2021 referral and the other credible accounts of defendant hitting her children. Further, we agree with the judge that although defendant did not strangle A.A. to a state of unconsciousness, "engag[ing] in some form of strangulation" by placing her "hands around . . . [A.A.'s] neck" was

21

disproportionate to the infraction and constituted excessive corporal punishment "in most, if not all, cases."

To the extent we have not specifically addressed a particular argument, we deem it without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

22