**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2838-23

DEPARTMENT OF CHILDREN
AND FAMILIES, DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Petitioner-Respondent,

v.

A.R-S.,

      Respondent-Appellant.

_____

Submitted December 1, 2025 – Decided January 5, 2026

Before Judges Sabatino and Natali.

On appeal from the New Jersey Department of Children and Families, Division of Child Protection and Permanency, Docket No. AHU 22-0426.

Schwartz, Hanna, Olsen & Taus, PC, attorneys for appellant (Christopher Olsen, of counsel and on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney

General, of counsel; Mary L. Harpster, Deputy
Attorney General, on the brief).

PER CURIAM

Aaron[1] is the biological father of R.S. (Raisa), and A.S. (Aisha) born November 11, 2009, and April 19, 2012, respectively. He challenges the May 20, 2024 final agency decision by the Department of Children and Families, Division of Child Protection and Permanency (Division) that affirmed an Administrative Law Judge's (ALJ) determination substantiating him for the sexual abuse of Raisa. Because we discern nothing arbitrary, capricious, or unreasonable concerning the Division's decision, we affirm.

I.

In February 2022, PESS-Bridgewater Behavioral Health Services contacted the Division to report that Raisa, then twelve, had disclosed that Aaron physically abused her. She made the disclosure while being psychiatrically evaluated for suicidal ideations. Raisa was also being treated for depression and anxiety.

A Division investigator interviewed Raisa shortly thereafter and she disclosed Aaron had also sexually abused her. The investigator immediately

---

[1] We use initials and pseudonyms to protect the privacy of the minor child and the parties included. R. 1:38-(d)(12).

A-2838-23

referred the allegations to the county prosecutor's office, which resulted in Detective Carolina Moreno interviewing Raisa. During that interview, Raisa informed the detective her father did "stuff to [her]" like hitting, kicking and slapping her. Raisa also stated Aaron frequently touched her inappropriately on her chest, stomach, back, "butt," legs, and "sometimes he got like really close to down there." She informed the detective that Aaron also forced her to sit on his lap and while on his lap, Aaron would pull her near "his thing" and she would feel it moving while he repositioned his body. Throughout the interview Raisa used an anatomically correct doll to detail Aaron's actions.

Raisa next informed Detective Moreno that when the family lived together, her mother and father slept separately "across the house" and she and her sister took turns sleeping with each parent. She reported recalling that sometimes when she slept in her father's bed, she also felt his "thing" "moving a little" against her legs and "butt" and she attempted to move away from him, but Aaron pulled her closer. Although she initially thought it was her father's hand rubbing against her, she eventually saw "it was his thing." When she told him to stop, he told her he was just "joking around." Again, using an anatomically-correct doll and pictures, Raisa identified where Aaron touched her with his "thing", and confirmed it was his penis.

A-2838-23

Raisa also detailed that, when she was eight or nine, while sleeping in her father's bed, she awoke and found him on top of her moving "up and down" and his "thing" was going inside her which she said "[k]ind of hurt." According to Raisa, Aaron was breathing heavily, and he told her not to move. At the time Raisa stated she was unaware about "sex and stuff," and she was confused why her father was behaving this way and did not know what he was doing was "bad or anything."

Additionally, Raisa told Detective Moreno Aaron "raped" her when she was nine and stated he stuck his "thing . . . down there," "like having sex." She stated she was alone with Aaron, and he suggested they play "cops and robbers." She described how Aaron tied her to a chair with zip ties and "search[ed]" her and he then he put "his thing in [her] thing" after spreading her legs. She described his "thing" as "kind of hard" and that a "clear like whitish" substance came out and went "all over" her "down there." Raisa explained that by "down there" she meant the front of her genital area. When Raisa asked her father to remove the zip ties because they hurt, he refused and only cut them off when he heard her mother coming home. Raisa stated she did not tell anyone about the abuse nor did she tell her father to stop because she was afraid of him.

A-2838-23

Detective Moreno later recorded a phone call between C.F. ("Claire"), Raisa's biological mother, and Aaron during which Aaron denied all of the allegations and stated Raisa fabricated the cops and robbers story. The police also interviewed Aaron during which he again denied all of Raisa's allegations and submitted to a lie detector test, which was determined to be truthful, but inconclusive according to a Division report.

Claire confirmed during the interview that she saw Aaron play roughly with the children and also, they would take turns sleeping with each of them when Claire and Aaron began sleeping in separate rooms. She could not recall coming home to see Raisa tied to a chair with zip ties but confirmed they had zip ties in the home.

Claire also informed a caseworker that Raisa had experienced some blood "spotting" at the age of nine, this incident being around the same age Raisa reported Aaron had "raped" her. Aaron acknowledged during the interrogation that he was the parent who stayed home with the children when they were sick but denied he ever acted inappropriately with Raisa. Although he denied Raisa slept in his bed, he nevertheless confirmed that Aisha would sleep in his room "more often."

A-2838-23

Raisa's individual therapist, Cynthia Goldberg, deemed Raisa's statements about Aaron's sexual abuse believable based on her gradual disclosure of information and the fact she remembered more details, which she explained was typical of how children disclose sexual abuse. Based on her evaluation, Raisa attended a psychosocial evaluation at the Dorothy B. Hersh Regional Child Protection Center (Hersh) with Rebecca Pluciniak, Psy.D., who diagnosed Raisa with adjustment disorder with mixed anxiety and depressed mood and suspected child sexual abuse.

Raisa next attended an evaluation at Hersh with Gladibel Medina, M.D., to address treatment recommendations. During her evaluation Raisa reported to Dr. Medina that when she was in the third grade her father touched her "front genital area" with his hand and his penis which was painful and caused some bleeding.

Raisa also disclosed to Dr. Medina that on one occasion Aaron held a knife to her neck. Based on that disclosure, Detective Moreno reinterviewed Raisa. During that second interview, Raisa stated Aaron held a "big, orange knife" to her throat during the "cops and robbers" incident and told her he would cut her with it if she moved and was "so scar[ed]." Raisa also disclosed that Aaron recently held a small, orange-handled curved knife to her throat at his restaurant

6

when she spilled hummus. She also stated he threatened to cut her head off if she did it again. Raisa also told the detective her father called her "a whore," "a slut," and "the 'b' word," when she made mistakes and said she was a "drama queen" if she cried after he hit her.

In July 2022, the Division concluded its investigation and informed Aaron it had substantiated him for the sexual abuse allegations and concluded it deemed Raisa's claims of physical abuse were not established. Aaron disputed the substantiation finding, requested a hearing, and the matter was accordingly transmitted to the Office of Administrative Law (OAL).

ALJ Kimberley M. Wilson presided over the multi-day hearing where the Division presented the testimony of caseworker Marcel Rogers, Detective Moreno, and the expert psychological testimony of Dr. Pluciniak. Aaron testified on his own behalf and presented Dr. Medina as an expert in pediatrics with a child abuse specialty.

Det. Moreno confirmed she had investigated other cases with similar allegations of sexual abuse involving children Raisa's age, and those cases did not always have evidence of injury to the child's vagina because such injuries depended on many factors. When the Division played the videos of Raisa's two interviews with Det. Moreno, Aaron asked to be excused from the courtroom.

Dr. Pluciniak testified that Raisa was uncomfortable and nervous when discussing Aaron's sexual abuse, which she described as typical in similar situations. She also stated Raisa's psychological testing detailed she suffered from depression, trauma, withdrawal, and anxiety, along with daydreaming and nightmares. Dr. Pluciniak stated her role was only to assess Raisa's mental health and not to conclusively determine if she was sexually abused. However, during her assessment of Raisa's functioning, Dr. Pluciniak stated Raisa's symptoms, testing and self-reporting were consistent with having been sexually abused and she accordingly diagnosed her with suspected sexual abuse.

During her testimony, Dr. Medina confirmed that during her examination, Raisa did not evidence any signs that a penis entered her vagina. Nevertheless, and based on her over two decades of experience, Dr. Medina stated that children often report "having sex" if any "contact of the genital region" occurs and not only when the penis enters the vaginal canal. She therefore opined her examination was not inconsistent with Raisa's statement she had "sex", as young children often use the term to describe when the penis enters only the front of the vagina, which is still painful and may cause some bleeding. Dr. Medina further explained that when a penis enters further near the hymen it would be "super painful" in a child as young as Raisa.

8

Further, Raisa did not disclose any vaginal penetration by Aaron when Dr. Medina evaluated her and as a result, Dr. Medina explained she did not address with Raisa exactly what she meant as her vagina, a term which Dr. Medina nevertheless stated most children use for "their front private part." She also explained she did not use the term "intact" when describing Raisa's hymen because the term does not provide meaningful medical detail. Rather, she described Raisa's hymen as having a smooth border with no signs of trauma, which, however, was consistent with the characterization of the hymen as "intact."

Aaron testified and stated Raisa moved out of the home when she was "eight, eight and a half" and never returned to sleep there since, although he did take his daughters to trips out of state. He expressly denied ever abusing Raisa and stated he first heard about the allegations when Claire told him over the phone after Raisa made her disclosures to the Division. He attributed Raisa's false allegations on Claire's influence over Raisa, and so Claire could obtain leverage in their divorce.

ALJ Wilson issued an initial decision in which she affirmed the Division's substantiation of sexual abuse. The ALJ found all witnesses, except Aaron, credible. The ALJ Judge found Raisa's detailed description during her interview

9

with Detective Moreno, credible as Raisa "stated clearly what she believes occurred" and the statements were consistent with her report to Dr. Pluciniak and Rogers.

Rogers' testimony was found to be "professional and direct," and Det. Moreno, who the ALJ noted remained calm during her testimony, was "professional and straightforward." She summarily characterized Dr. Pluciniak's testimony as "clear" and "professional" and her diagnosis of suspected child abuse supported by Raisa's symptoms. ALJ Wilson also determined Dr. Medina was "professional and direct." She also explained that because Dr. Medina's testimony about Raisa's hymen being intact did not "lend itself to a factual determination" as to whether Raisa was subjected to sexual assault, she disregarded it.

Contrariwise, the judge determined Aaron was not credible and expressly rejected as unsupported his allegations that Raisa fabricated her abuse. ALJ Wilson based her adverse credibility findings, in part, on Aaron's refusal to even listen to "the allegations that [Raisa] made against him" and instead choosing to leave the courtroom when Raisa's interviews were played. By absenting himself from the proceedings, the judge explained Aaron evaded the court's and cross-examination on anything raised in the interviews. She explained he was

A-2838-23

effectively "permitted to deny the allegations without allowing an analysis of his credibility or reactions when confronted with the evidence against him." The judge concluded Aaron sexually abused Raisa on two occasions—once while she slept his bed and the second time during the "cops and robbers" incident. Accordingly, the ALJ found the Division's proofs sufficient for a substantiated finding under N.J.A.C. 3A:10-7.3(c)(1). Further, the ALJ found that based on its factual findings that Aaron sexually abused Raisa, no mitigating factors applied. N.J.A.C. 3A:10-7.4(a)(2).

The Assistant Commissioner for the Division affirmed the Division's sexual abuse finding against Aaron and accepted all of the ALJ's findings. The Assistant Commissioner determined the record, the ALJ judge's credibility and factual findings determinations fully supported a substantiated finding by a preponderance of the evidence that Aaron "engaged in multiple acts of sexual molestation" of Raisa. This appeal followed.

II.

In his first argument, Aaron challenges the Division's decision and maintains it was based on the ALJ's, and Assistant Commissioner's, flawed factual findings that disregarded Dr. Medina's testimony, and which specifically ignored inconsistencies in Raisa's testimony regarding the cops and robbers

11

incident. On the former point, he specifically argues, based on Dr. Medina's testimony, Raisa's statements that his alleged sexual assault involved his penetration of Raisa's vaginal area were impossible as Dr. Medina stated Raisa's hymen as "annular with smooth border" which she later acknowledged meant was "intact." As to the cops and robbers incident, Aaron maintains Raisa's "story changed every time she recounted her story" to the prosecutor's office and despite these glaring inconsistencies, ALJ Wilson inexplicably found Raisa's testimony credible.

In his second point, Aaron maintains the Division's substantiation finding was erroneous because it was based on Raisa's videotaped statement that was not "corroborated" or otherwise supported by substantial credible evidence in the record. Specifically, he argues Dr. Medina confirmed that "Raisa never disclosed any allegations of penetrative sexual abuse," and because Raisa did not testify, under N.J.S.A. 9:6-8.46(a)(4), "her prior out-of-court statements be corroborated" which the record fails to establish. We are unpersuaded by all of Aaron's arguments.

Judicial review of quasi-judicial agency determinations is limited. Allstars Auto. Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (citing Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14,

27 (2011)). "[A]n appellate court reviews agency decisions under an arbitrary and capricious standard." Zimmerman v. Sussex Cnty. Educ. Servs. Comm'n, 237 N.J. 465, 475 (2019) (citing In re Stallworth, 298 N.J. 182, 194 (2011)). "An agency's determination on the merits 'will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Saccone v. Bd. of Trs., Police & Firemen's Ret. Sys., 2019 N.J. 369, 380 (2014) (quoting Russo, 206 N.J. at 27). The party challenging the administrative action bears the burden of making that showing. Lavezzi v. State, 219 N.J. 163, 171 (2014).

"Appellate courts owe deference to the trial court's credibility determination . . . because it has 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" C.R. v. M.T., 248 N.J 428, 440 (2021) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)). The deferential standard is applied "because an appellate court's review of a cold record is no substitute for the trial court's opportunity to hear and see the witnesses who testified on the stand." Balducci v. Cige, 240 N.J. 574, 595 (2020). We apply "de novo review to an agency's interpretation of a statute or case law." Russo, 206 N.J. at 27 (citing Toll Bros., Inc. v. Twp. of W. Windsor, 173 N.J. 502, 549 (2002)); see also Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)

13                                                                          A-2838-23

("Agencies . . . have no superior ability to resolve purely legal questions, and . . . a court is not bound by an agency's determination of a legal issue . . . ."

An "abused or neglected child" is defined under N.J.S.A. 9:6-8.21(c)(3) as "a child less than [eighteen] years of age whose parent or guardian . . . commits or allows to be committed an act of sexual abuse against the child." N.J.S.A. 9:6-8.21(a) defines parent or guardian in pertinent part as: "any natural parent, adoptive parent, resource family parent, stepparent . . . or any person who has assumed responsibility for the care, custody, or control of a child . . . ."

Under regulations associated with Title IX, allegations that a child has been abused or neglected can either be "substantiated," "established," "not established," or "unfounded." N.J.A.C. 3A:10-7.3(c); see also N.J. Dep't of Children and Fams. v. R.R., 454 N.J. Super. 37, 40 (App. Div. 2018) (citing Dep't of Children & Fams. v. D.B., 43 N.J. Super. 431, 441-42 (App. Div. 2015)). An allegation shall be "substantiated" if the preponderance of the evidence indicates that a child is an "abused or neglected child" as defined by N.J.S.A. 9:6-8.21 and either the investigation indicates the existence of any of the circumstances outlined under N.J.A.C. 3A:10-7.4 or substantiation is warranted based on consideration of the aggravating and mitigating factors listed in N.J.A.C. 3A:10-7.5. Pursuant to N.J.A.C. 3A:10-7.3(d), "[a] finding of

14

either established or substantiated shall constitute a determination by the Department that a child is an abused or neglected child pursuant to N.J.S.A. 9:6-8.21."

Mindful of the legislative and regulatory scheme as set forth above, and because we find substantial, credible evidence in the record to support the Division's findings, we affirm substantially for the reasons set forth in the ALJ's determination and the Assistant Commissioner's final decision. We add the following comments.

The ALJ had the opportunity to hear testimony, review exhibits, and make credibility determinations and her determinations as to witness credibility are entitled to our deference in light of her careful consideration of the facts and detailed, supported findings of fact. See M.M. v. Dep't of Children & Families, 479 N.J. Super. 471, 482 (App. Div. 2024). With respect to Raisa's testimony, upon which the ALJ relied to support the substantiation finding, the court specifically found she recounted Aaron's abuse when she slept in his bed and during the cops and robbers incident. ALJ Wilson determined as to Raisa's statements her "account of what occurred is substantially similar to what she told Marcel Rogers and [Dr.] Pluciniak." The ALJ also found, upon consideration of all the evidence that Raisa's videotaped interview was "credible

as she stated clearly what she believes occurred."  In sum, the ALJ carefully considered Raisa's testimony, including any inconsistencies, and found that it was substantially similar to the narrative she offered to two other investigators. We discern no basis to disturb these findings.

We also reject Aaron's argument that the ALJ ignored exculpatory evidence that "[Medina] testified that Raisa never disclosed any allegations of penetrative sexual abuse, and her physical examination revealed [Raisa's] hymen was intact—findings which contradict [Raisa's] detailed claims of repeated sexual penetration", and that Raisa's uncorroborated extrajudicial statements were not sufficient to make a finding of abuse.  Aaron mischaracterizes and ignores the rest of Dr. Medina's testimony that children lack a complete understanding of their physical bodies and what occurs to them during sexual abuse.  Aaron's argument further disregards Dr. Medina's testimony that children refer to their entire front genital region as their "vagina," and report "having sex" as scenarios involving "contact of the genital region."  Aaron's argument fails to address that Raisa's description of "having sex" is consistent with Dr. Medina's testimony of how children report abuse that is not vaginal penetration.  In sum, contrary to Aaron's arguments, Dr. Medina's physical examination of Raisa was consistent with Raisa's report of "having sex".

16

With respect to his claim the ALJ ignored exculpatory evidence, we reject it for the reasons previously stated. It is clear from our review of the record that the ALJ and the Assistant Commissioner considered all the evidence and found Raisa's version more credible than Aaron's.

We also find unpersuasive Aaron's reliance on N.J.S.A. 9:6-8.46(a)(4). N.J.S.A. 9:6-8.46(a)(4) provides that "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." N.J.S.A. 9:6-8.46(a)(4). Thus, according to Aaron an uncorroborated previous statement is not solely sufficient to find abuse. The Division maintains the corroboration requirement does not apply to administrative proceedings and, even if it does, sufficient evidence exists in the administrative record corroborating Raisa's out of court statements.

"A child's statement need only be corroborated by '[s]ome direct or circumstantial evidence beyond the child's statement itself.'" N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 157 (App. Div. 2018) (alteration in original) (quoting N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 522 (App. Div. 2017)). "The most effective types of corroborative evidence may be eyewitness testimony, a confession, an

A-2838-23

admission or medical or scientific evidence." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003)). Such indirect evidence has included "a child victim's precocious knowledge of sexual activity, a semen stain of a child's blanket, a child's nightmares and psychological evidence." N.J. Div. of Child Prot. & Permanency v. I.B., 441 N.J. Super. 585, 591 (App. Div. 2015) (quoting N.J. Div. of Youth & Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002)). Evidence of "age-inappropriate sexual behavior" can also provide the necessary corroboration required under N.J.S.A. 9:6-8.46(a)(4). Z.P.R., 351 N.J. Super. at 435-36. In N.B., the court found no corroboration where the child "denied thoughts of self-harm; his mood was normal and appropriate; he was cooperative during his evaluation; . . . and he denied problems with appetite, sleep, or mood." 452 N.J. Super. at 522.

Here, even accepting Aaron's position that corroboration is required to support an administrative substantiation finding, we are satisfied that the ALJ's and Assistant Commissioner's determinations did not rely solely on Raisa's statements. Rather, there was ample evidence and testimony to corroborate Raisa's allegations of sexual abuse. Indeed, the ALJ considered Raisa's

testimony in tandem with testimony by Detective Moreno, Dr. Pluciniak, caseworker Marcel Rogers, Dr. Medina, and the documentary evidence.

First, Raisa's report of her abuse is corroborated by her description of Aaron's penis as "hard," a "clear like whitish" substance coming out of it, and of Aaron's heavy breathing during the abuse. Next, Raisa's statements are corroborated by Claire's confirmation the parents slept in separate bedrooms, the children took turns sleeping with each parent, Aaron was the parent who stayed home when a child was sick, Aaron interacted roughly with the children, and there were zip ties in the home.

Further, Raisa's statement that she experienced bleeding after her father touched her "front genital area" was corroborated by Claire's report of Raisa having premature spotting at the same age as the incident. Raisa's report was also corroborated by Dr. Pluciniak's testimony about the results of Raisa's evaluation, which showed the psychological impact of the abuse on her, trauma symptoms, anxiety, depression, and nightmares. I.B., 441 N.J. Super. at 591. Additionally, Dr. Medina's testimony corroborated Raisa's description of what occurred as consistent with how young children experience sexual abuse. Further, Aaron's testimony was also heard and considered in opposition. In determining the credibility of the witnesses and their testimony, the ALJ found

all except Aaron to be credible. On this record we are persuaded the Division's decision is neither arbitrary, capricious, nor unreasonable.

To the extent we have not otherwise addressed the parties' arguments, it is because we have considered them and concluded they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2838-23